DECISION
The matter is before the Court for a decision on the issue of whether Defendant, Edwin Marrero, (hereinafter "Defendant") is competent to stand trial on the charges against him.
 BACKGROUND AND TRAVEL
Defendant was arrested on July 30, 2006 and charged with first degree child molestation pursuant to G.L. 1956 § 11-37-8.1. He was held without bail at his initial presentment. He was arraigned in the Superior Court on November 15, 2006 and held without bail. A bail hearing was scheduled for November 24, 2006, but the defense was not ready to proceed at that time. The bail hearing was scheduled three (3) more times before it was continued on January 22, 2007 pending further investigation. Thereafter, a motion to issue a subpoena duces tecum was granted, and the case was continued multiple times for pre-trial conference, control dates, issuance of additional subpoenas, and further investigation.
On the dates of January 24, 2008 and February 4, 2008 defense counsel moved for an order to evaluate the Defendant to determine whether Defendant was competent to stand trial. A competency evaluation was ordered, and a competency report was returned to the Court on March 20, 2008 indicating that Defendant was competent.
On April 4, 2008, defense counsel moved to continue the case on the grounds that he believed Defendant was not competent. The matter was continued numerous times thereafter *Page 2 
until defense counsel secured an expert to perform a further evaluation of Defendant for a determination of Defendant's competency. After obtaining an opinion from his own expert, Defendant, through counsel, demanded a hearing on the issue of his competency to stand trial.
A hearing was commenced in the Superior Court on March 2, 2009. The matter was continued for hearing on ten (10) different dates, the dates being March 2, and 4, July 1, 13, and 14, August 25 and 26, and September 16 and 30, and testimony concluded on October 26, 2009. Transcripts for each day are before the Court totaling 438 pages in all. The Court received testimony and exhibits from Dr. Richard Ober and Dr. Ronald Stewart on behalf of Defendant and from Dr. Barry W. Wall on behalf of the State of Rhode Island.
 THE APPLICABLE LAW
The law presumes the Defendant to be competent in this jurisdiction. See G.L. 1956 § 40.1-5.3-3 (b):
 (b) Presumption of competency. A defendant is presumed competent. The burden of proving that the defendant is not competent shall be by a preponderance of the evidence, and the burden of going forward with the evidence shall be on the party raising the issue. The burden of going forward shall be on the state if the court raises the issue.
In the instant case, Defendant has raised the issue of his competence; and Defendant has the burden of going forward with the evidence on the issue. Competency is also defined in the same statute § 40.1-5.3-3 (a):
 (2) "Competent" or "competency" means mental ability to stand trial. A person is mentally competent to stand trial if he or she is able to understand the character and consequences of the proceedings against him or her and is able properly to assist in his or her defense. *Page 3 
The same section of the statute also defines what it means to be incompetent to stand trial:
 (5) "Incompetent" or "incompetency" means mentally incompetent to stand trial. A person is mentally incompetent to stand trial if he or she is unable to understand the character and consequences of the proceedings against him or her or is unable properly to assist in his or her defense;
The law provides for a hearing on the issue of competency where the issue is in dispute.
 (g) Hearing. Upon receipt of the report and appropriate notice to the parties, the court shall hold a hearing unless the report concludes that the defendant is competent and the defendant and the attorney for the state in open court state in writing their assent to the findings. At the hearing, the report shall be introduced, other evidence bearing on the defendant's competence may be introduced by the parties, and the defendant may testify, confront witnesses, and present evidence on the issue of his or her competency. On the basis of the evidence introduced at the hearing, the court shall decide if the defendant is competent.
 See also State v. Peabody, 611 A.2d 826, 829 (1992) citingState v. Cook,104 R.I. 442, 447-48, 244 A.2d 833, 835-36 (1968). In the instant case, the report concluded that Defendant was competent, and Defendant took issue with that finding. Defendant subsequently retained experts who evaluated Defendant and offered the opinion that Defendant was not competent to stand trial.
 DEFENDANT'S MAIN ASSERTION[1]
Defendant's main assertion during the course of the proceeding was that Defendant was unable to understand the character and consequences of the proceedings and would be unable to *Page 4 
properly assist in his defense at trial. The reason for the above asserted inability was due to Defendant's very low IQ[2] score coupled with other factors as described by the witnesses for defendant.
 Defendant's witnesses Richard W. Ober, Ph.D.
Defendant's expert, Richard W. Ober, Ph.D., met with and spoke to Defendant and thereafter estimated that the Defendant's "level of intellectual functioning was in the 60 — 70 IQ range."[3] Dr. Ober thereafter met with Defendant at the Intake Service Center and requested Defendant to submit to an examination. Defendant agreed and the instrument employed in the examination was the Wechsler Adult Intelligence Scale — IV (WAIS-IV). Dr. Ober reported the results during his testimony. He indicated that Defendant's verbal comprehension score was a 63, the perceptual reasoning was 58, working memory was 63, and processing speed was 56. Dr. Ober reported that the Defendant's full scale IQ after testing (which he testified was a "performance IQ") was 53. He further testified that in his opinion, the Defendant's verbal comprehension and working memory indexes were in the mildly mentally retarded range; and the perceptual reasoning, processing speed, and Full Scale IQ were in the moderately mentally retarded range. His report, dated December 14, 2008 indicated that he felt that Defendant's level of intellectual functioning was "significantly impaired" and that it "would be very difficult for [Defendant] to participate in his defense."[4] *Page 5 
Dr Ober is self employed as a psychologist. He received a Ph.D from Michigan State University and worked in the counseling department for three years. He taught at Rhode Island College for three years then opened a private practice in the R.I. — Mass area. He has been court qualified as an expert witness in Massachusetts a number of times by his testimony. He testified that he was qualified as an expert in a competency hearing in R.I. Family Court. His private practice involves outpatient psychotherapy with adult patients. He testified that he sees himself primarily as a cognitive therapist.
Dr. Ober testified that "competency to stand trial" meant "that the person has the cognitive ability to understand the nature of the offenses, the court system, evidence, the opposing sides and what they represent, the role of the judge, factors related to jury selection, evidence, types of negotiations that may occur between counsel regarding a disposition of the case that may avoid going to court, or rather obviate going to court, . . . types of pleas a person may make, what kind of sentences they may incur as a result of a plea or a conviction." (Tr. 3/2/09 at pps. 6, 7 ll. 18-25 and 1-2 on p. 7). When questioned about this going beyond the precise legal standard that doctors use in this jurisdiction, the witness indicated that he was "not sure I could describe it in precise legal terms." (Tr. p. 7 ll. 13-14.) Dr. Ober testified as to the two reports he prepared regarding the case (Defense Ex. A) reflecting his meetings with Defendant on December 8 and 14 of 2008.
When asked whether Defendant could "reasonably assist his attorney at trial", the witness responded "[I]t would be a very difficult task, in my opinion, because of the low intelligence. (Tr. p. 28 ll. 21-22.) He later gave his opinion that Defendant was "not competent to assist in his defense." (Tr. p. 29 l. 5.) He based the opinion on two facts, namely Defendant's inability to understand the process itself, and the Defendant's cognitive impairment. The witness later *Page 6 
indicated that the impediments standing in the way of allowing Defendant to assist his attorney at trial involved Defendant's "adequate understanding of the abstract matters involved in the law and appreciation of those." (Tr. p. 32 ll. 19-21.) The witness's opinion was based upon both the test score and his interaction with Defendant. (Tr. p. 39 ll. 18-20.)
The witness admitted that he met with defendant for approximately 3 hours[5] over two meetings in December of 2008 at the ACI intake center (Tr. p. 35 ll. 16-25) and didn't inquire about or discuss with him the Defendant's criminal history, other court appearances, allegations in the instant case, or specifics of a trial but just general legal concepts. (Tr. p. 36 ll. 8-21). The witness did testify that while he was aware of the factors to be considered in a competency evaluation, but he had not read the R.I. law recently and could not recall the last time he did read the R.I. law. (Tr. p. 37 ll. 14-18).
 Dr. Ronald M. Stewart
After graduating from Providence College, the witness went to Seton Hall Medical School, New Jersey College of Medicine, (general medical degree), and then went on to intern at Rhode Island Hospital and then to Massachusetts General Hospital where he was a resident clinical research fellow at Harvard Medical school. The witness's concentration while in residency was all psychiatry until he went into the United States Navy as a physician. After his service in the Navy, he began a private practice in general psychiatry on the East Side of Providence in 1973. He first testified in court as a forensic psychiatrist in 1974. He has testified as an expert in psychiatry in Rhode Island Probate Courts, District Court, Traffic Tribunal, *Page 7 
Superior Court and Federal Court. He testified that he has testified as an expert some 50 — 60 times[6] in Rhode Island and approximately 20 times in Massachusetts.
The witness indicated he met with Defendant for a total of an hour and a half on two occasions. (Tr. July 14, 2009 p. 15 ll. 12-15.) In an exchange not mentioned by Defendant or the State in their respective briefs, the witness was asked:
 Q. Now, as to why he (defendant) was there, was he able to tell you why he was there?
 A. Yeah. In his own very primitive sort of way. He said something to the effect, "They say I bothered a kid." He was very, very general. Then he said to me in the same sort of garbled, not terribly coherent or clear fashion that he would never bother a kid because he had two kids of his own. (Tr. July 14, 2009 p. 16 ll. 2-9.)
The exchange continued:
 Q. One of the things you said was, you asked him about the charge. Was he able to explain to you what the charge against him was?
 A. Yeah, bothering the kid.
 Q. And, when you asked him what could happen to him, did he understand?
 A. Yeah, he said he could go to jail and he could get ten years.
 Q. And was he able to explain to you what the role of the prosecutor was?
 A. Yes. He said the prosecutor was against him and wanted to put him in jail.
 Q. And how about the defense attorney? Was he able to explain that?
 A. Trying to keep me from going to jail.
 Q. How about the jury? *Page 8 
 A. He was as clear on the jury. The jury decides.
 Q. And
 A. But then, on the other hand, when I asked him about the judge, he said the judge decides too. So, it was kind of, it has to be taken into account that this man has very, very little education and not very good command of the English language. He is somewhat bilingual. His primary language is Spanish, but he is a — unfortunately not a very articulate fellow. So, what I got, to quote the previous testimony which I heard Dr. Wall say he was very rudimentary. I think rudimentary is a good term that Dr. Wall used.
 Q. When you asked him these questions as to why he was there and the charges, the prosecutor's role, the judge's role, the jury's role, the defense attorney's role, when he gave you those answers, did you try to delve into more detail from him.?
 A. That took a lot of time. I kept trying to rephrase the questions and it didn't seem to much help. He kept giving me these primitive answers.
 MS. COTE: I can't hear the witness.
 A. It didn't seem to help, me trying to rephrase the questions or trying to be more persistent. He kept giving me these very primitive simplistic answers, and it became apparent to me that he was trying as hard as he could and he just didn't have the cognitive abilities to try harder. So that is when it occurred to me that I would like to have him psychologically tested so I could get some idea on what he had to work with. (Tr. July 14, 2009 Beginning p. 16 l. 10 and ending p. 18 l. 4)
The witness later indicated that it was very apparent that Defendant was dealing with a significant handicap regarding his intellectual function. When asked how he was able to determine that, the witness testified,
 A. Well, his inability to use language appropriately. His inability to process information well. His simplistic answers. His inability to elaborate. His obvious impairment, executive ability and abstract thinking. (Tr. July 14, 2009 p. 21 ll. 7-10.) *Page 9 
When asked what he meant when he testified the defendant was not able to process information well, the witness answered: "Well, he would give simplistic answers. He wouldn't process the information. It seems as though he couldn't get beyond a certain — he'd get stuck. He'd say so much about something, and when I tried to encourage him to speak more he would just be stuck. That happens with people who have intellectual impairment. They can go so far. They can just run so fast. So, he had definitely obvious (sic) developmental problems." (Tr. July 14, 2009 p. 21 ll. 15-22.)
The witness testified that after reviewing Dr. Ober's report and conferring with Dr. Ober, it confirmed his subjective impression that Defendant was deficient in his intellectual functioning. He recalled an IQ in the mildly retarded range of 60 to 70. (Tr. July 14, 2009 p. 26 ll. 17-25.) He acknowledged later that Dr. Ober had concluded Defendant had a full scale IQ 53 with a verbal comprehension of 63. (Tr. p. 27.) The witness also considered Defendant's work history, (Tr. p. 29 ll. 23-24.) and he defined "executive function" as the "ability to think conceptually, to understand the ramifications of actions of — let's say not in a concrete or primitive fashion." (Tr. p. 32 ll. 14-16.)
The witness gave an opinion that Defendant was not competent to stand trial to the charges against him. (Tr. p. 36 ll. 6-7). He based that opinion on his two evaluations of the defendant during his visits at the ACI and his evaluation of Dr. Ober's testing; and Defendant's extensive history of "neurodevelopmental disorder, occupational difficulties, educational difficulties, and major mental illness and treatment for major mental illness, (Tr. p. 36 ll. 18-25), which he gleaned from a review of the documents he was given pertaining to Defendant. The witness testified that cognitive impairment or major mental illness alone could impair Defendant's ability to be competent to stand trial, but combining the two of them, "you have a sort of perfect storm." (Tr. p. 41 ll. 3-7). *Page 10 
The witness also gave an opinion that Defendant "is not able to reasonably, rationally and factually assist counsel in his own defense", (Tr. p. 41 ll. 24-25), "because of the severity of his mental illness and the severity of his cognitive impairment." (Tr. p. 42 ll. 2-3).
The witness was asked:
 Q. If a person has an IQ between 53 and 65, and the onset of that is before age 18, and he has an impairment of daily functions, would that person be able to reasonably and rationally . . .assist their attorney at trial?
 A. He would not be able to reasonably, factually and rationally assist counsel. (Tr. p. 49 ll. 18-24).
The witness dismissed an assertion previously made by Dr. Wall that Defendant was trying to obtain the best possible outcome in the case. The witness stated "his expressing a desire to have the best possible outcome for himself is only a basic human emotion of wanting to seek the good for oneself and would have no bearing on his competency to stand trial." (Tr August 25, 2009[7] p. 5 l. 17 through p. 6 l. 1). He also noted that Defendant processes his information very slowly. (Tr. August 25, 2009 at p. 7 l. 7). He takes issue with several recommendations made by the State in its report calculated to enhance Defendant's ability to understand and assist in his defense claiming the recommendations are not realistic. He criticizes the report and testifies, "Nowhere here does it say how [defendant] is going to conceptually understand the testimony of witnesses and communicate with his attorney in an abstract way." (Tr. August 25, 2009 p. 12 ll. 12-14). When explaining the difference between a factual and a rational understanding of the charges, the witness testified:
 A. He is simplistic and concrete and that he just understands the meaning of terms. Now whether he understands what happens in the courtroom and what the defense lawyer's true burden is, what *Page 11 
the prosecutor's true burden is and how they interact and how they obtain information from witnesses, and whether he has information or he can question witnesses through his attorney are the areas I feel that Mr. Marrero is severely impaired and not rationally and reasonably capable to understand the system. (Tr. August 25, 2009 p. 19 ll. 11-20).
On October 26, 2009, the witness acknowledged that if a patient had a history of malingering, that would be an important factor in evaluating the patient for competency. (Tr. October 26, 2009 p. 12 l. 10). The witness also testified that Defendant's appearance and vocal productions led him to the belief that Defendant was "somebody who had some genetic longstanding impairments that might best be elucidated to the expertise of a psychologist rather than simply mental illness. His mental illness was very obvious through his behavior, swallowing razor blades and his history of suicidal behavior since he was eight or ten years old, which is well documented." (Tr. October 26, 2009 beginning at p. 15, l. 21 through p. 16 l. 4). The witness testified he was also aware of Defendant's documented history of feigning symptoms to get what he wants. (Tr. October 26, 2009 p. 17 ll. 23-25). He agrees with the cross examiner that Defendant has a history of malingering or attempting to malinger for some degree of gain; and thereafter, testifies explaining that he evaluates the patient and asks for corroborative exams. (Tr. October 26, 2009, p. 20 ll. 1-23). At the end of his explanation, the witness testifies, "I'm not saying he [defendant] doesn't do bad things. I'm just saying the criminal area is probably the wrong place to have him and he probably needs treatment. He may need full-time supervision in a sheltered workshop, group home, or in a forensic unit. I'm not saying there is nothing wrong with this fellow or he is not dangerous, but I am saying that I do not believe that he has competency, mental capacity to be able to effectively assist counsel in his own defense." (Tr. October 26, 2009, beginning p. 20 l. 23 through p. 21 l. 7). *Page 12 
The witness recounted his recollection of his earlier testimony with the cross examiner stating "[W]hat I believe I testified to in this case and in other cases is that the defendant should have a rational and factual understanding of the nature and possible charges against them and should be able to rationally and factually assist counsel in their own defense. It is actually — when I refer to the competency evaluation, I saw there was so many impediments to his competency by admission of the former worker who assessed him for Doctor Wall, that there are so many conditions placed on it, they need so many different types of support, that this man is not competent from the get-go, even in the assessment of the worker from the forensic unit, with would so many met, that it presents almost a utopian situation, and frankly, it is fairly unrealistic." (Tr. October 26, 2009, p. 22 l. 21 through p. 23 l. 10). When pressed further, the witness testified:
 "I believe I already answered the question, in all due respect. We're talking about an over-simplified response by the defendant to questions or appropriate response to the defendant by questions (sic) but a rational and factual understanding as is cited in Dusky v. Indiana[8] and other citings (sic) that show that competency to stand trial is not a simple open and shut situation and many parameters have to be taken into account in assessing a patient's or a defendant's state of mind, a patient's functioning must be taken into mind, level of medication (sic). It is a very complex paradigm. It just doesn't lend itself to a simplification." (Tr. October 26, 2009, beginning p. 24 l. 15 through p. 25 l. 2).
The witness acknowledged that Defendant's IQ, measured over the course of 25 years by three or four different workers is always in the 60 range. (Tr. October 26, 2009, p. 26 ll. 13-16). The witness conceded to the cross examiner that he needed to ask Defendant certain questions in order to perform his testing and evaluation, and Defendant gave his consent but the witness *Page 13 
testified he had no idea whether Defendant consented knowingly or not. (Tr. October 26, 2009, p. 31 ll. 8-22). On redirect examination, the witness testified that he found no evidence of malingering when he met with Defendant on the two occasions he described. (Tr. October 26, 2009, p. 33 ll. 18-21). When asked how Defendant's history "of doing things to get to serve his sentence in the forensic unit" played into his opinion of Defendant's competency, the witness answered, "I think it is pretty much a child-like ploy to try to get himself into a better place, just like some five or six-year-old who wants to stay at his grandmother's house as opposed to his parent's house because maybe he gets more cookies, or the house is less crowded, less noise, a more pleasant environment." (Tr. October 26, 2009 beginning at p. 26 l. 21 through p. 27 l. 3.)
 State's witness Dr. Barry Wall
Dr. Wall has a private practice and is also the Director of forensic services at the Eleanor Slater Hospital, which is part of the Department of Health. The witness graduated from the Medical University of South Carolina and completed a combined internship in residency training program at the Brown Medical School. He completed a Psychiatry and Law fellowship at the University of Massachusetts Medical Center in Worcester, Massachusetts. He is board certified in adult psychiatry and licensed to practice in the State of Rhode Island since 1993. As Director of forensic services, he conducts and oversees evaluations of criminal defendants for the purpose of determining their competency to stand trial and has done so since 1995. He conducts hundreds of such evaluations annually and estimates he has done what he describes as a number in the "low thousands" of these evaluations.
The witness agrees that such evaluations are primarily clinical (Tr. March 4, 2009 p. 6 l. 3.), but the evaluations also include the person's history, mental status examination, asking *Page 14 
specific questions that are part of the competency evaluation process, and other data, which includes police reports, prior competency exams, prior hospitalizations, when it is believed to be relevant. (Tr. March 4, 2009 p. 6 ll. 4-15). The witness testified that he was familiar with Defendant and indicated that in March of 2008 the Forensic Services Unit was asked to conduct a competency examination of Defendant and one of the residents under his supervision conducted the exam, discussed the case with him, reached her own conclusion and then the report was submitted to the Court. (Tr. March 4, 2009 p. 7 ll. 3-7). The witness indicated that this was the seventh of a total number of competency exams that had been done by Mental Health and Retardation Hospitals (MHRH) on Defendant since 1997, six of which he supervised, and one of which he participated in directly.
The witness testified that Dr. Melissa Ludwig met with Defendant on March 17, 2008 for a period of 2 hours. He testified that there was "copious data from other competency reports, one previous hospitalization that [defendant] had with us where we got to know him very well. So we discussed the meaning of all that data and then she arrived at her own opinion about it. She conducted a specific test called the CAST-MR, the Competency assessment Screening tool for persons with Mental Retardation and as a result of integrating all this data she reached her opinion that [Defendant] was competent to stand trial and her opinion is also based on the CAST-MR score." (Tr. March 4, 2009 p. 10 l. 18 through p. 11 l. 3). The witness also testified that he had an "awareness" of Defendant's history with his department. (Tr. March 4, 2009 p. 11 ll. 5-6).
The witness testified that the residents that rotate in the department come to him to learn so they can be trained as psychiatrists. He explained they are always in their last year of that training and this is what he did with Dr. Ludwig. (Tr. March 4, 2009 p. 17 ll. 4-17). He testified *Page 15 
that together they reviewed Defendant's personal history that was largely obtained from a prior evaluation in October of 2006, Defendant's ACI records regarding his detention, Dr. Ludwig's taking of Defendant's mental status exam, her assessment of Defendant's prior six competency exams, and a history of a hospital stay that he had with the department in 2002. (Tr. March 4, 2009 p. 18 ll. 2-10). The witness also recounted a personal experience he had with Defendant in 2002 when Defendant was actually a patient on the Forensic Unit. He had examined him on September 30, 2002. (Tr. March 4, 2009 p. 21 ll. 8-9). The witness went on to describe his finding that Defendant had an antisocial personality disorder back in 2002. He explained this goes to Defendant's fabrication of symptoms and Defendant's exaggeration of symptoms. Specifically the witness testified that Defendant ended up "saying to the effect that he exaggerated symptoms to get into the hospital. Further, he ended up saying later that he faked heart attack symptoms to be transported off the Forensic Unit to Kent Hospital where he pulled out his intravenous line and attempted to escape." (Tr. March 4, 2009 p. 31 ll. 5-10). The witness testified he was familiar with Dr. Ludwig's opinion that Defendant attempted to "fake on the CAST-MR examination in 2008." (Tr. March 4, 2009 p. 32 ll. 19-20). The witness testified that it was his opinion that Defendant "doesn't meet the criteria [for mental retardation] but had severe intellectual impairment." (Tr. March 4, 2009 p. 33 ll. 19-21).
Regarding any IQ tests administered to the Defendant, the witness testified that he knew Dr. Lucatella administered a BETA test to the Defendant and he scored a 65 although he felt that Dr. Lucatella thought that this was an underestimation of Defendant's true abilities. (Tr. March 4, 2009 p. 36 ll. 10-12).
The witness was asked about Dr. Ober's testing of the Defendant and testified that he noted the Defendant's "verbal comprehension and working memory, [defendant] actually scored *Page 16 
a 63" . . . and he felt that score was "more relevant for competency exam for a person working with a defense attorney to be able to understand things verbally and to remember things at least in the short run, rather than drawing blocks on a picture. (Tr. March 4, 2009 p. 40 ll. 8-14).
The witness testified that, in his opinion, that the Defendant was competent to stand trial because Defendant "has a sufficient understanding of the charges and potential consequences. He has a sufficient understanding of the trial process. He has demonstrated the ability to participate in his own advocacy issues at the hospital, and therefore, I believe, he should have the ability to participate in his defense." (Tr. March 4, 2009 p. 43 ll. 6-11). The witness explained that when Defendant was in the hospital "back in 2002, he recognized his rights. He asked for an advocate for the things he thought he needed." (Tr. March 4, 2009 p. 43 ll. 15-17). When questioned specifically whether the Defendant understood the charges against him, the witness testified, "He was able to describe to Dr. Ludwig his version of the alleged incident. He has generally asserted his innocence, and often, people that are actually mentally retarded will reveal more information than they are aware they need to. He will typically refrain from that, which is a good sign. He is understanding and articulated that it is a felony offense — an alleged felony offense." (Tr. March 4, 2009 p. 44 ll. 8-14). With respect to Defendant's understanding of the consequences of the proceedings against him, the witness testified "[H]e has a concrete — not an abstract understanding of the potential charges, like entering a guilty plea or a not guilty plea, and has a basic understanding of what a trial would mean." (Tr. March 4, 2009 p. 44 ll. 18-21). The witness noted Defendant has had a common-law marriage, (Tr. March 4, 2009 p. 46 ll. 1-2), and discussed his knowledge and observations of Defendant and Defendant's daily activities that he has been able to observe over the years. (Tr. March 4, 2009 p. 46 ll . 2-12). *Page 17 
 Cross examination of Dr. Wall
The witness was cross-examined extensively[9] by defense counsel. He admitted that he had no personal knowledge of several of the facts he had previously testified to and he did not personally question Defendant in 2008. He denied suggesting to Dr. Ludwig that she should find Defendant competent.
 The Competency Report State's Exhibit #1
Melissa Ludwig performed a competency evaluation on Defendant on March 17, 2008. The time of evaluation is listed as 120 minutes. While the entire report will not be reprinted here, the Court has reviewed the report many times before, during, and after the hearings. The relevant portions are set forth in this section with lengthy portions paraphrased where possible. The report clearly indicates that defendant was competent to stand trial. (Form A). Defendant's version of the incident as indicated on the report, "It's first degree child." `I was at my dad's visiting him' and he is alleged to have had sexual contact with a boy, `and I told [this mother] I wouldn't hurt kids, I have my own.'" (Competency Report p. 1 of 17). Family psychiatric history — mother had possible major depression as well as bipolar disorder. Evaluee's developmental history was not known. The 6th grade was the highest grade of school completed. Childhood sexual abuse was reported by first older brother at age 5 and also for ages 13-16 by a man who was known by Defendant's father.
Defendant's childhood history included fire setting intending to cause damage, truancy, running away from home twice, and staying out a night before age 13 despite parent's rules. His work history indicates he was on SSI at age 21, held no job for over 10 years but work as a *Page 18 
packer in a factory is listed for 2003. The best job listed is a dishwasher. (Competency Report p. 2 of 17).
The report indicates that Defendant has had two relationships and realized he was homosexual in the ACI in 1991. He has 2 boys aged 11years and 10years but put them up for adoption at 2 and 1 years of age and has no contact with them.
His functional assessment includes the notation, "says he needs help taking a shower, I don't remember to take one." It is noted he was seen in the emergency department several times for swallowing razor blades, had a previous heart attack, suffered physical abuse from his father as a child, and has a substance abuse history with cocaine and marijuana. (Competency Report p. 3 of 17).
Defendant's psychiatric history includes notations "Bipolar" and "and I'm mentally retarded." Medications are listed as Thorazine, Depakote, and Cogentin. He is quoted as saying, "I don't take meds when I can choose because they effect my sexual ability." (sic). The boxes indicating depression, hallucinations, and panic attacks are listed under review of systems with the notation, "no current hallucinations." His legal history includes a charge he shot off a shotgun at 21 years, 1st degree child molestation in 1992, and the current charge. (Competency report p. 4 of 17).
Defendant provided information to Dr. Ludwig indicating he has been "here" two years, has been in and out of segregation because of swallowing razor blades, has suicidal thoughts occasionally, and has been on and off CMS (crisis management status) due to self injurious behavior. His mental status exam indicates he was cooperative. (Competency Report p. 5 of 17).
While boxes indicating depressed and mild were checked, his though process was evaluated as "logical, coherent and relevant" by checking the box. Other thought content was *Page 19 
listed as "clear sensorium, no hallucinations." But he was listed as impaired. (Competency Report p. 6 of 17)
Information derived from the interview included information about previous competency exams in 1997 (competent), 1998 (competent), 9/18/2002 (incompetent), 9/30/2002 (competent) with a large portion of the 2002 report included in the latest report which include his personal, medical, and substance abuse history. The notes indicate that Defendant feels no guilt or remorse about his legal history. There is an indication he tried to contact an attorney to speak about his case and has stated "I don't want to make a deal." (Competency Report p. 11 of 17). On 9/25/02, Defendant was placed in Kent County Hospital for a heart attack. While there, he tried to pull out his intravenous line and tried to escape. The information includes a note that Defendant later admitted to a mental health worker that he faked his chest pain, allegedly saying "I faked the heart attack. . .I can do what I want." (Competency Report p. 11 of 17). The story continued noting that defendant indicated he wanted to go to court to tell the judge that he wanted to serve his time in the hospital because he wouldn't be back at the ACI. Further, the 2002 report concludes he was "feigning symptoms of mental illness to attempt to appear incompetent to stand trial. (Competency Report p. 12 of 17).
Defendant answered the usual and customary questions regarding his understanding of the charges and consequence of the charges. There is a note he appeared evasive during administration of the CAST-MR test. (p 15 of 17).
The report concludes that Defendant has "some competency related deficits" but he has an understanding of the charges, potential consequences, and has a rudimentary understanding of the legal system and has a concrete ability to work in his defense. *Page 20 
He is described with borderline intellectual functioning, and Dr. Ludwig lists a set of six suggestions (interventions) that will "partially remediate" Defendant's trial related competency impairments. (Dr. Wall testified during the hearing that these were suggestions or recommendations for defense counsel.).
 Analysis
At the outset, it is important to note that Defendant's main assertion — specifically that if a person was mentally retarded, that would render that person unable to assist in his or her defense and properly understand the proceedings, [10] appears to have evaporated to some extent in the post hearing memoranda. Apparently, Defendant concedes that "[I]t is undisputed that Marrero understood the nature of the charges against him and that he [,]on some level[,] appreciated the purpose of the proceedings. Both experts agreed in regard to those factors." See Defendant's MemorandumRegarding competency, p. 2, 2nd paragraph on page. While that conclusion is not readily apparent from a review of the testimony of Dr. Stewart and Dr. Ober, this Court will accept the concession and analyze the remaining factors necessary to resolve the matter.
Additionally, the fact that a person is evaluated as mentally retarded does not automatically make him or her incompetent to stand trial by virtue of that evaluation. Defendant correctly cites the case of Godfrey v. Georgia,446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398, "Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial, but, by definition, they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions. Their *Page 21 
deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability." See Defendant'sMemorandum Regarding competency, p. 6, 2nd
paragraph on page.
Several cases demonstrate that individuals with low IQ scores may, in fact, be found to be competent and convictions for their alleged crimes have been affirmed. Some of the cases where a defendant was found competent despite a low IQ score include: Connell v.Alabama, 7 So.3rd 1068, 1082 (Ala. 2008) (Defendant's former IQ scores of 84, 76, and 69 dropped to 53 and 54 after his arrest. Found competent and conviction for murder and second degree assault affirmed); U.S. vDecoteau, 2009 WL 2749189 (D.N.D.) (IQ 55, use of CAST-MR test and defendant diagnosed as functioning in the mild range of mental retardation; found to be competent despite impairment; it is well established that the burden of proof of competency is on the Government to prove competency by a preponderance of the evidence in federal cases); Tennessee v. Blackstock, 19 S.W.3rd 200, 202, 206 (Tenn. 2000) (conviction for aggravated sexual battery of seven-year-old child affirmed; IQ of 55 and 47; finding of competency affirmed); Fairchild v.Lockhart, 744 F. Supp. 1429 (Ark. 1989) (habeas proceeding after capital murder conviction; IQ Full Scale IQ of 63, a Verbal IQ of 69, and a Performance IQ of 61. The petition alleges that those scores are consistent with a finding that petitioner is "mentally retarded."; relief denied regarding incompetency to stand trial issue). Hibbert v. Poole,415 F.Supp.2d. 225, 239 (USDC WD NY 2006) (habeas corpus proceeding after defendant pleaded guilty to charges of second degree murder and second degree criminal possession of weapon and his conviction was affirmed on appeal; defendant's mental retardation, standing alone, did not prevent him from knowingly and intelligently entering voluntary guilty plea; IQ of approximately 59). Atkins vVirginia, 536 U.S. 304, 309 (2002) (Defendant was convicted; defendant's IQ was 59; execution was cruel and unusual NOT conviction); US v Rodriguez-Leon, *Page 22 402 F.3d 17, 20, 22 (1st Cir 2005) (denial of request to Withdraw plea; Defendant had an IQ of 62, id. at 20; The standard for competence to stand trial is the same as for entering a plea, id. at 22); US v Lauzon,938 F2d 326 (1st Cir 1991) (Maine case — drug case LSD psilocin; Guilty plea — ground for departure from sentence benchmark argument denied; IQ between 65-75 or 66-80, id. at 329; defendant was a "follower);Wills v Texas, 511 U.S. 1097 (1994) (capital case; cert denied more for procedural reasons; IQ of 61); Tennard v Dretke,542 U.S. 274 (2004) (murder conviction and death sentence; IQ of 67, id. at 277; remand for mitigation — implicit that he was competent to stand trial)
Given the above cases and Defendant's concessions, the Court will now go on to analyze and assess the remaining factors, namely, whether Mr. Marrero is able to understand the character and consequences of the proceedings against him, and whether he is able properly to assist in his defense. G.L. 1956 § 40.1-5.3-3 (a) (2) and State v. Peabody,611 A.2d 826, 829 (1992) citing State v. Cook,104 R.I. 442, 447-48, 244 A.2d 833, 835-36 (1968).
Given that the competency report ordered by the Court indicated that Defendant was competent to stand trial, the Defendant bears burden of proof in contesting the issue, and Defendant must demonstrate his competence by a fair preponderance of evidence. Section 40.1-5.3-3 (b). Proof by a preponderance of the evidence means that a jury must believe that the facts asserted by the proponent are more probably true than false. Parker v.Parker, 103 R.I. 435,442, 238 A.2d 5, 61 (1968).
 Analysis of expert testimony for weight andcredibility
The resolution of this particular matter involves, in part, a decision by the Court as the finder of fact as to what credibility and what weight to assign the expert testimony before the *Page 23 
Court. Determinations of a hearing justice regarding the competency of expert witnesses have traditionally been afforded great latitude. "The test of qualification as an expert witness lies in the sound discretion of the hearing justice, and his or her determinations in this regard will not be disturbed in the absence of clear error or abuse." Ferland Corp. v. Bouchard,626 A.2d 210, 215 (R.I. 1993) (citations omitted). In addition, when a hearing justice sits as the finder of fact and evaluates the testimony of properly qualified experts, "[the] [hearing] justice retains the authority to determine the credibility of each expert's evidence. . . ." Conti v. Rhode Island Economic DevelopmentCorp., 900 A.2d 1221, 1238 (R.I. 2006) (citations omitted). Just as a hearing justice may pick and choose among evidence presented by laypersons, he or she may do the same when dealing with evidence of experts. Harvard Pilgrim Health Care of New England, Inc., v.Gelati, 865 A.2d 1028 (2004). [A] [hearing] justice was free to choose between expert opinions so long as he did so not from mere whim or fleeting caprice but with reasonable justification.State v Cook, 104 R.I. 442, 449 244 A.2d 833, 836 (1968).
 Dr. Stewart's assertions and Defendant's case.
The primary basis for Defendant's case is Dr. Stewart's opinion that Defendant is retarded, and also had a significant handicap regarding his intellectual function. Dr. Stewart noted that Defendant had an inability to use language appropriately and could not "process information well." Dr. Stewart testified that after observing that, the Defendant would give simplistic answers and he "would get stuck." That is why he requested the intellectual testing by Dr. Ober. The testing confirmed Dr. Stewart's opinion that Ddefendant had a major mental illness and severe cognitive impairment, and either one could cause Defendant to be incompetent to stand trial. However, taken together, they formed a "perfect storm." (Tr. 7/14/09 p. 41 ll. 3-7). *Page 24 
Dr. Stewart dismissed the information contained in the current competency report that Defendant had malingered in the past and had sought to obtain the best possible advantage for himself by serving his time in the hospital rather than the ACI. Dr. Stewart also dismisses the recommendations made at the end of the current evaluation which were meant to help defense counsel facilitate Defendant's participation during a trial.
Dr. Stewart gave his opinion that Ddefendant could not rationally and factually assist counsel in his own defense. The Court's impression of Dr. Stewart's testimony is that Defendant cannot assist in his own defense because, due to his inability to process quickly, Defendant would be too slow. For example, if Defendant was present during certain testimony, and wanted to give his thoughts to counsel during the trial, he would not be able to articulate them in time. It should be noted that Dr. Stewart met with the Defendant for approximately 1.5 hours in two sessions of approximately 45 minutes each.
 Dr. Ober supports Dr. Stewart's testimony
Dr. Ober, after testifying about the results of the test he administered, gave his opinion that Defendant was not competent to stand trial or assist in his defense. When asked to name the factors, Dr. Ober described several factors, which are listed earlier, supra
(Tr. 3/2/09 p. 6 ll. 18-25 p. 7 ll. 1-2). Those factors appear to go somewhat beyond exactly what is required in this jurisdiction. Furthermore, Dr. Ober was unable to testify as to the precise standard used by case law and statute in this jurisdiction defining competence and incompetence to stand trial. *Page 25 
 Dr. Wall's opinion contradicts the above twoexperts.
Dr. Wall did not personally perform the competency evaluation of Defendant. He admits that such evaluations are clinical, and he has no personal knowledge of various factors which are presently before the court. His lack of personal knowledge is unfortunate. Dr. Wall did testify about the methodology used at the Forensic Unit where trainees are assigned to perform competency evaluations "under his supervision." He testified that the process was the way such evaluations were done for the Forensic Unit. While his lack of personal knowledge lessens the weight of his testimony somewhat, it is not fatal in this particular case. Dr. Wall is still allowed to testify as an expert and give opinion pursuant to R.I. Rules of Evidence, Rule 703. That rule provides:
 Rule 703. Bases of Opinion Testimony by Experts
 An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source
In the instant case, Dr. Wall testified that he actually supervised Dr. Ludwig and conferred with her on the test. He did not meet Defendant personally for the March 17, 2008 evaluation, but he was familiar with all of the information in the report. Further he was personally familiar with Defendant in 2002 when defendant was reported to have "faked a heart attack." Dr. Wall testified that, in his opinion, the Defendant is purposely underperforming on the IQ test. Further, he testified that his opinion is justified by the information in the competency report about Defendant wanting to serve his time in the hospital rather than the ACI. Dr. Wwall *Page 26 
also cites, during his testimony, that Defendant actually told a case worker, "I faked a heart attack, I can do what I want" as mentioned previously herein. Dr. Wall's time spent in the presence of Defendant over the years, and his level of familiarity with Defendant acquired over the years depicted in the competency evaluation far outnumber the 1.5 hours spent by Dr. Stewart and the 3 hours spent by Dr. Obert. Dr. Wall forcefully testified that he felt Defendant understood the character and consequences of the proceedings against him and also that defendant could properly assist in his own defense.
 Resolving conflicts in testimony
Dr. Wall's lack of personal knowledge regarding the latest evaluation with defendant lessens the weight accorded to his testimony. The Court is somewhat troubled with the methodology used involving a trainee who evaluates a defendant, who is later unable to testify at a competency hearing, [11] leaving Dr. wall to testify as an expert. It would appear that many of the trainees are apt to move on once they graduate, and they may not continue service on the Forensic Unit much longer once they obtain a license to open a practice. The problem is exacerbated in capital cases with a victim of tender age. A jury trial is undoubtedly a stressful event. If a reviewing court later rules that the finding of competency was erroneous, the matter may need to be retried, or, in the worst case, the matter may never be retried.
Notwithstanding, although Dr. Stewart has more years in practice than Dr. Wall, Dr. Wwall is board certified in adult psychiatry. He has been Director of forensic Services where he conducts and oversees evaluations of criminal defendants and has done so since 1995. He testified that he has done, in his estimation, a number in the "low thousands" of such evaluations *Page 27 
or supervisions. Dr. Wall also testified that he has written on, conducted seminars on, and engaged in teaching about conducting competent to stand trial evaluations. (Tr. September 14, 2009, p. 43 ll. 13-23.) Dr. Ober was not familiar with the precise terms of the R.I. statute on competency to stand trial and, given the factors he listed that go toward that finding, it appears that they require at least slightly more than required under the applicable statute. Further, given the passage set forth in Godfrey v Georgia, supra, it appears that Dr. Ober may be slightly prone to overemphasize the importance of IQ testing.
The Court has closely examined all of the information contained in the current evaluation dated March 17, 2008 (State's Ex. 1), especially in regard to feigning illness, "faking" a heart attack, Defendant's desire to serve his time at the hospital rather than the ACI, and his request to speak to his attorney, whose name he knew as reflected in the notes. Given all of the information contained in Ex. 1, Dr. Wall was allowed to give his opinion, based on that information, as to whether Defendant was competent.
Dr. Stewart and Dr. Ober were also able to establish rapport with Defendant and obtain his cooperation in 1.5 hours and 3 hours respectively. While the Court is cognizant that Dr. Stewart has testified that it took Defendant a "long time" to articulate certain answers and informative statements during Dr. Stewart's time with Defendant, the Court refers to an exchange cited by no one in the post hearing memoranda. That exchange, as indicated earlier, involved Dr. Stewart's initial encounter with defendant, who told Dr. Stewart, "they said I hurt a kid. I wouldn't hurt a kid, I've got kids of my own." This appears to be a rational response in which Defendant denies the incident while establishing that he was in the vicinity at least. The fact that it may be difficult to articulate a plausible scenario which exonerates the Defendant is a different matter than being unable to properly assist on one's own defense. Finally, the Court did *Page 28 
have occasion to observe the Defendant respond to the call of the case on each hearing day long before such was suggested in the state's post hearing brief. The Defendant was able to promptly and correctly respond with his name and date of birth when asked as the hearing was called to order each day.
 Burden of proof
Given all of the above considerations, based upon the testimony of Dr. Stewart and Dr. Ober, as well as the exhibits submitted in the case, the Court is unable to find that the facts and opinions asserted by Dr. Ober and Dr. Stewart, taken together with due consideration of all exhibits in the case, are more probably true than not.
 Findings
After consideration of the Court's own notes and observations, a review of all transcripts and exhibits, and a review of the post hearing memoranda as well certain cases described herein, this Court finds:
 1. Defendant is able to understand the character and consequences of the proceedings against him
 2. Defendant is able properly to assist in his defense.
 3. The Defendant is competent to stand trial to the charges against him.
[1] Originally Defendant's main assertion was that if a person was mentally retarded, that would render that person unable to assist in his or her defense and properly understand the proceedings.See e.g. Tr. March 4, 2009 p. 59 ll. 16-21. Counsel took this exact position at other times during the competency hearing. It appears that by virtue of arguments made in his post-hearing brief, and by certain case law discussed infra that he has adjusted that position and modified it somewhat.
[2] IQ or intelligence quotient refers to a score derived from one of several different standardized tests designed to assess intelligence.
[3] Report of Dr. Ober, Human Service Consultants, Ltd., dated December 8, 2008 which is a part of Defendant's Ex. A admitted in full.
[4] Report of Dr. Ober, Human Service Consultants, Ltd., dated December 14, 2008 which is a part of Defendant's Ex. A admitted in full.
[5] The transcript reference to 30 hours appears to be mistaken.
[6] Dr. Stewart originally testified that he had testified as an expert in Rhode Island over a hundred times. He specifically said, "Well, let's say, rounding it off thirty years, maybe four times a year, maybe five times a year. I've testified over a hundred times." (Tr. July 14, 2009 p. 6 ll. 14-16.)
[7] Due to the piecemeal nature of this proceeding, given the Court's schedule, and the professional schedules of the witnesses, direct and cross examinations did not proceed from day to day but were interrupted by a period of several weeks in some cases and with intervening examinations in between on other occasions.
[8] Dr. Stewart appears to be referring to Dusky v. UnitedStates, 362 U.S. 402 (1960) holding that it is not enough for the district judge to find that defendant is oriented to time and place and has some recollection of the events, but the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. The case was remanded to the district court for a hearing on those issues.
[9] The cross examination was conducted beginning on March 4, 2009 for 15 pages of that transcript, and then again on the dates of July 1, 2009 (29 pages), July 13, 2009 (50 pages), and August 26, 2009 (19 pages) Redirect occurred on September 16, 2009 (79 pages) and again on September 30, 2009 (32 pages) followed by cross exam on September 30, 2009 of another 8 pages.
[10] Footnote 1, supra.
[11] Apparently Dr. Ludwig is engaged in an active practice at a facility in the City of Providence but the State indicated that since Dr. Ludwig was no longer in the employ of the State, there would be a need to pay her an expert fee for her opinion testimony and they were not able to produce Dr. Ludwig on those terms or as part of the Forensic Unit. (Tr. September 30, 2009, p. 5 ll. 9-18.)